UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTIN J. WALSH,<br>Secretary of Labor,<br>United States Department of Labor,<br><br>*Plaintiff*,<br><br>v.<br><br>GARGAN STABLES CORP., and DANNY GARGAN, Individually and as President,<br><br>*Defendants.* | Complaint<br><br>Civil Action No.: 21-cv-03390 |

1.  Plaintiff, Martin J. Walsh, Secretary of Labor, United States Department of Labor (the "Secretary"), by and through undersigned counsel, brings this action pursuant to Section 16(c) and Section 17 of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201, *et seq.*) ("the Act" or "the FLSA"), alleging that Defendants violated Sections 7, 11(c), 15(a)(2), and 15(a)(5) of the Act; to recover back wages and liquidated damages; to enjoin acts and practices that violate the provisions of the FLSA; and to obtain other appropriate relief.

2.  The Secretary brings this action seeking back wages, liquidated damages, and other relief for the employees who care for and assist in training thoroughbred horses at Defendants' stables in Elmont, New York, and assist in racing the horses in Queens, New York. Since at least December 28, 2017, Defendants have underpaid at least thirty such employees, known as groomers and hot walkers, in New York. These employees are crucial to Defendants' operations; their duties include warming horses up ahead of races and workouts, cooling the horses down afterwards, and cleaning the horses, stables, and equipment.

3. Defendants continuously and willfully withhold from employees wages they are lawfully owed for long hours caring for Defendants' horses. Though employees' weekly work hours vary based on the racehorses' schedules and training needs, Defendants wrongfully paid flat rates that regularly deprive employees of required overtime pay and minimum wages. And although Defendants sometimes, though not always, pay employees an extra amount for additional assignments such as working race days, the extra pay is not based on employees' actual hours worked and does not include all overtime premiums owed under the Act.

4. In furtherance of their willful scheme, Defendants have directed employees to sign incomplete or false timesheets and maintained other false records of employees' hours intended to show compliance with the Act when in reality they serve to conceal Defendants' actual payment scheme and FLSA violations.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to Section 17 of the FLSA, 29 U.S.C. § 217, and 28 U.S.C. §§ 1331 and 1345.

6. Venue of this action lies in the United States District Court for the Eastern District of New York because a substantial part of the events or omissions giving rise to the claims occurred in this District, specifically in Nassau and Queens Counties. 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### THE PARTIES

*Plaintiff*

7. Plaintiff Martin J. Walsh is vested with authority to file suit to restrain violations of the FLSA and recover back wages and liquidated damages, and is the proper plaintiff for this action.

*Defendants*

8. Defendants Gargan Stables Corp. ("Gargan Stables") and Danny Gargan together employ groomers, hot walkers, assistant trainers, and forepersons at thoroughbred horse training stables and racetracks in Elmont and Queens, New York.

Corporate Defendant Gargan Stables

9. Defendant Gargan Stables is a Corporation organized under the laws of the State of New York, with a registered address at 20 Cunningham Ave, Floral Park, New York 11001.

10. Gargan Stables operates a year-round horse training stable at Belmont Park Race Track ("Belmont"), located at 2150 Hempstead Turnpike, Elmont, New York 11003.

11. In addition to Belmont, Gargan Stables attends races elsewhere in New York, including at the Aqueduct Racetrack in Queens, New York.

12. Gargan Stables is an employer of its groomers and hot walkers within the meaning of Section 3(d) of the Act, 29 U.S.C. § 203(d).

Individual Defendant Gargan

13. Defendant Gargan, an individual, is a founder, President, and sole owner of Gargan Stables.

14. Gargan has served as Gargan Stables' head trainer at all times relevant to this Complaint.

15. Defendants employ assistant trainers to assist in management of Gargan Stables's stables, including the Belmont stables.

16. Gargan hired Gargan Stables's assistant trainers at all times relevant to this Complaint.

17. Gargan set Gargan Stables's assistant trainers' rates of pay at all times relevant to this Complaint.

18. Gargan has actively overseen Gargan Stables' day-to-day operations nationwide at all times relevant to this Complaint.

19. At all times relevant to this Complaint, Gargan regularly spoke with the assistant trainers at Gargan Stables's stables to discuss the details of the stable operations, horses' performance, training schedules, diet, exercise, and the tasks to be performed by Gargan Stables's groomers and hot walkers.

20. At all times relevant to this Complaint, Gargan determined the training schedule for the horses Defendants train.

21. At all times relevant to this Complaint, Gargan regularly traveled to Gargan Stables's stables, including to Belmont.

22. At all times relevant to this Complaint Gargan attended races at Belmont and Aqueduct to observe the performance of horses cared for by Gargan Stables's groomers and hot walkers.

23. At all times relevant to this Complaint Gargan regularly discussed the training and care of horses with Gargan Stables's assistant trainers and forepersons, including tasks to be performed by Gargan Stables's groomers and hot walkers.

24. Gargan directly supervised Gargan's assistant trainers and forepersons at all times relevant to this Complaint.

25. Gargan set hot walkers' and groomers' rates and methods of pay at all times relevant to this Complaint.

26. At all times relevant to this Complaint, Gargan had final say over hot walkers' and groomers' rates and methods of pay.

27. Defendant Gargan is an employer of Gargan Stables's employees within the meaning of Section 3(d) of the Act, 29 U.S.C. § 203(d).

**DEFENDANTS ARE AN ENTERPRISE ENGAGED IN COMMERCE**

28. Defendant Gargan Stables is an enterprise within the meaning of Section 3(r) of the Act, 29 U.S.C. § 203(r).

29. In addition to New York, Defendants train horses at stables in Kentucky and Florida.

30. Defendants race horses in Kentucky and Florida.

31. At all times relevant to this Complaint, Gargan Stables has had an annual gross volume of sales made or business done in an amount not less than $500,000.

32. Defendants employ the hot walkers and groomers listed in Exhibit A, as well as other employees, in the activities of an enterprise engaged in commerce or in the production of goods for commerce, including the handling of, selling of, or otherwise working on goods or materials that have been moved in or produced for commerce. These goods include but are not limited to horse feed, horse bedding, harnesses, saddles, stirrups, reins, bits, brushes, liniments, poultices, and horse blankets.

33. Defendants' employees have been employed in an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of Section 3(s)(1)(A) of the Act, 29 U.S.C. § 203(s)(1)(A).

**DEFENDANTS' PROHIBITED PAY PRACTICES**

*Defendants Fail to Pay Premium Pay for All Overtime Hours Worked*

34. From at least December 28, 2017 through the present, Defendants failed to pay required overtime premiums to hot walkers and groomers when they worked more than 40 hours in a given week. The overtime violations stem from at least two interrelated practices. First, Defendants knowingly undercount groomers' and hot walkers' actual hours worked, concealing from payroll and time records many of the hours spent performing assigned tasks. Second, rather than paying employees based on their actual hours worked, Defendants have paid a combination of fixed salaries and lump sums based on factors such as the number of horses cared for and number of additional tasks assigned. Accordingly, in workweeks for which employees worked overtime, Defendants have failed to properly calculate and pay employees the required overtime premiums.

<u>Defendants Systematically Undercount Employees' Hours and Falsify Time
Records to Conceal Actual Hours Worked, Denying Premium Pay for All Hours Worked</u>

35. As a result of the training schedules and assignments, Defendants require their hot walkers and groomer employees to work schedules that vary from day to day and week to week. However, Defendants do not properly take the hours actually worked into account when calculating the wages owed to their employees.

36. Instead, Defendants pay their hot walkers and groomer employees a weekly base rate depending, in part, on their job duties and the number of horses they attend to.

37. The base rate is paid without regard to the number of hours Defendants' hot walker and groomer employees actually work.

38. Defendants' employees employed as groomers perform duties that include brushing horses, clipping their hair, cleaning the stables and equipment, taking the horses to designated locations at the track on race days and returning the horses to the stables after races.

39. Defendants' employees employed as hot walkers are primarily responsible for walking and exercising horses, including warming them up ahead of races or other workouts, and cooling them down afterwards.

40. Defendants' hot walkers also have some responsibilities for cleaning stable areas and the horses themselves, bringing water to the horses, doing laundry, and holding horses while being attended by a blacksmith.

41. Defendants' groomers regularly work for Defendants in excess of 40 hours per week.

42. Defendants' hot walkers regularly work for Defendants in excess of 40 hours per week.

43. Defendants do not accurately track employee work time or start and stop times each day.

44. In a typical non-race week, Defendants generally assign groomers to work a base number of hours each week.

45. In a typical non-race week, Defendants generally assigned hot walkers to work a base number of hours each week.

46. The base assigned schedule for groomers is typically a minimum of approximately 52 hours or more per week not including any additional time for other work such as races. Groomers typically work these hours over a seven-day workweek.

47. In addition to this base schedule, groomers work substantial additional hours for Defendants each week, such as for the extra time associated with bringing horses to and from races on race days, remaining at the races, performing work at the races, traveling between racetracks (such as between Belmont and Aqueduct).

48. For hot walkers, the base assigned schedule is typically a minimum of approximately 35 hours per week not including any additional work such as races, which regularly requires them to work more than 40 hours per workweek. Hot walkers work these hours over a seven-day workweek.

49. In addition to this base schedule, hot walkers work substantial additional hours for Defendants each week, such as for the extra time associated with bringing horses to and from races on race days, remaining at the races, performing work at the races, traveling between racetracks (such as between Belmont and Aqueduct), and performing additional tasks such as laundry.

50. On race days at the Belmont racetrack, Defendants' employees typically work 3 hours or more on top of their base schedules.

51. On race days at the Aqueduct racetrack, Defendants' employees typically work six hours or more on top of their base schedules.

52. These hours are not accurately reflected or reflected at all on Defendants' timesheets and payroll records.

53. Defendants do not pay groomers and hotwalkers an hourly rate for each hour worked, instead paying a base weekly flat rate in addition to set amounts for additional tasks performed without regard to the number of hours actually worked.

54. Groomers do not sign in or out each day.

55. Hot walkers do not sign in or out each day.

56. Defendants require groomers and hot walkers to sign pre-printed timesheets.

57. Defendants do not maintain an electronic time keeping system.

58. Instead, Defendants create falsified timesheets that consistently underreport the number of hours worked by hot walkers and groomers each week, and incorrectly report the start and stop times.

59. Defendants regularly failed to record 1 to 12 or more hours of work per week for groomers and many hot walkers.

60. For example, for the workweek ending September 19, 2018, one of Defendants' timesheets shows that a groomer worked no afternoon hours. However, according to publically available records, the groomer worked for Defendants at a race at Aqueduct race track during the afternoons of September 14 and September 15, 2018—time nowhere accounted for in the weekly timesheet or on Defendants' payroll records.

61. By way of further example, for the workweek ending December 26, 2018, one of Defendants' timesheets shows that a hot walker allegedly worked a total of 45 hours notwithstanding the fact Defendants' own records and publically available records show the hot walker worked at the Aqueduct racetrack during the afternoons of December 21 and December 22, 2018. Moreover, according to Defendants' own records, the same hot walker spent four total hours above her standard morning hours on the afternoons of December 23 and December 25, 2018 walking horses, in addition to other time spent on other tasks such as laundry. Defendants accordingly undercounted the number of hours worked by the hotwalker by at least six hours.

62. At all times relevant to this Complaint, Defendants regularly denied their employees premium pay owed pursuant to the Act for all hours worked over 40 per week.

63. In many weeks, Defendants disregard their own falsified timesheet hours entirely and simply pay employees for fewer hours than recorded.

64. For example, for the workweek ending April 11, 2018, one of Defendants' timesheets shows that a groomer worked for 51.50 hours. However, according to Defendants' own payroll for the same week, Defendants computed the groomer's pay based on only an alleged 49 hours of work, denying the groomer overtime and regular wages due under the Act.

65. By way of further example, for the workweek ending April 4, 2018, one of Defendants' timesheets shows that a hot walker worked for 41 hours. However, according to Defendants' own payroll for the same week, Defendants computed the hot walker's pay based on only an alleged 40 hours of work, denying the hot walker overtime wages due under the Act.

66. As a result of Defendants' failure to compensate groomers and hotwalkers for all hours worked, Defendants failed to compensate their employees for work performed in workweeks longer than forty hours at a rate not less than one and one-half times the regular rate at which they were employed.

### Defendants Have Failed to Calculate Employees' Regular Rates and Premium Pay As Required Under the Act

67. At times relevant to the complaint, Defendants have also paid some hot walkers and groomers the same base salary week after week, without regard to actual hours worked, even though these employees worked more than 40 hours each of those weeks.

68. For example, a typical base weekly salary paid to groomers was $588.50 in 2018.

69. By way of further example, a typical base weekly salary paid to groomers was $633.00 in 2019.

70. For example, a typical base weekly salary paid to hot walkers was $489.50 in 2018

71. By way of further example, a typical base weekly salary paid to hot walkers was $543.00 in 2019.

72. In addition to the base salaries, at all times relevant to the complaint, Defendants have paid their employees additional lump sums not based on hours actually worked, but for performing other assigned tasks, such as accompanying horses to races.

73. For example, Defendants often paid employees approximately $25 or $40 for working on a race day, without calculating the actual overtime premium owed to each employee for the additional hours as required by the Act.

74. For example, in 2019, Defendants regularly assigned a groomer to work race days for three or more hours of work in race weeks, in addition to the base schedule of about 52 hours. For these additional hours in 2019, Defendants paid the employee only a lump sum of $40.50 in addition to the base salary, far less than the regular rate and overtime premium required for the additional hours.

75. At all times relevant to this Complaint, when employees worked in excess of 40 hours in a given workweek and were paid lump sums for extra tasks, Defendants did not include all required compensation in calculating the overtime wages due, as required by the Act.

76. Nor did Defendants take account of all hours worked when calculating employees' overtime compensation due in such workweeks, as required by the Act.

*Defendants' Violations of the Act Were Willful*

77. Defendants have long known that their pay and recordkeeping practices violate the FLSA.

78. Defendants constructed their payroll records for the specific purpose of hiding their failure to pay for all hours worked and to compute the appropriate regular rates for those hours worked.

79. Defendants' set the base salaries by reference to the applicable New York State minimum wage such that a set number of falsified recorded hours worked each week would equal the base salaries already set, including alleged overtime paid.

80. Indeed, Defendants' payroll records reflect Defendants' own knowledge of their obligations under the FLSA by including supposed "Regular" and "Overtime" hours, which are then falsified to back into the already established base weekly salaries plus whatever flat payments are paid.

81. Moreover, and as described herein, Defendants falsified their time records to underreport the actual hours worked and to avoid compliance with the Act's requirement that Defendants pay the required overtime premium for all hours worked beyond 40 in a week.

Tolling Agreement

82. On or about October 20, 2020, Gargan Stables, Corp., through Danny Gargan, in his capacity as President and CEO of Gargan Stables, Corp., and Danny Gargan, as an individual, and the Secretary, knowingly and voluntarily entered into a Statute of Limitations Tolling Agreement tolling the applicable statute of limitations from June 1, 2020 until and including November 16, 2020.

83. Accordingly, the Act's statute of limitations, as applied to all Defendants, shall be tolled from June 1, 2020 until and including November 16, 2020.

### FIRST CAUSE OF ACTION
### Violation of Sections 7(a) and 15(a)(2) of the FLSA
### Failure to Pay Overtime

84. The Secretary incorporates by reference and re-alleges the allegations in paragraphs 1 to 83 of the complaint.

85. Defendants willfully have violated the provisions of Sections 7 and 15(a)(2) of the Act by employing employees in an enterprise engaged in commerce or in the production of goods for commerce, for workweeks longer than forty hours, as prescribed in Section 7 of the Act, without compensating the employees for their employment in excess of the prescribed hours at rates not less than one and one-half times the regular rates at which they were employed.

86. Therefore, Defendants are liable for unpaid overtime compensation and an equal amount in liquidated damages under Section 16(c) of the Act or, in the event liquidated damages are not awarded, unpaid overtime compensation and prejudgment interest under Section 17 of the Act.

### SECOND CAUSE OF ACTION
### Violation of Sections 11(c) and 15(a)(5) of the FLSA
### Failure to Make, Keep, and Preserve Adequate and Accurate Records

87. The Secretary incorporates by reference and re-alleges the allegations in paragraphs 1 to 86 of the complaint.

88. Defendants willfully have violated the provisions of Sections 11(c) and 15(a)(5) of the Act, in that Defendants failed to make, keep, and preserve adequate and accurate records of their employees and of the wages, hours, and other conditions of employment as prescribed by the Regulations at 29 C.F.R. Part 516.

**WHEREFORE**, cause having been shown, Plaintiff respectfully requests that this Court enter judgment against Defendants as follows:

1. An injunction issued pursuant to Section 17 of the Act permanently restraining Defendants, their officers, agents, servants, employees, and those persons in active concern or participation with Defendants, from violating the provisions of Sections 6, 7, 11(c), 15(a)(2), and 15(a)(5) of the Act;

2. An order pursuant to Section 16(c) of the Act finding Defendants liable for unpaid overtime compensation found due Defendants' employees listed on the attached Exhibit A and an equal amount of liquidated damages (additional back wage compensation and liquidated damages may be owed to certain employees presently unknown to Plaintiff for the period covered by this Complaint); or

3. In the event liquidated damages are not awarded, for an injunction issued pursuant to Section 17 of the Act restraining Defendants, their officers, agents, employees, and those persons in active concert or participation with Defendants, from withholding the amount of unpaid overtime compensation found due Defendants' employees, and prejudgment interest computed at the underpayment rate established by the Secretary of Treasury pursuant to 26 U.S.C. § 6621;

4. An order compelling Defendants to reimburse the Secretary for the costs of this action; and

5. An order granting such other relief as the Court may deem necessary or appropriate.

DATED:  June 15, 2021
        New York, New York

                ELENA GOLDSTEIN
                Acting Solicitor of Labor

                JEFFREY S. ROGOFF
                Regional Solicitor

BY:    /s/ David J. Rutenberg
        DAVID J. RUTENBERG
        Trial Attorney

        U.S. Department of Labor,
        *Attorneys for Plaintiff Secretary of Labor*

        U.S. Department of Labor
        Office of the Regional Solicitor
        201 Varick Street, Room 983
        New York, NY 10014
        (646) 264-3686
        (646) 264-3660 (fax)
        rutenberg.david.j@dol.gov
        ny-sol-ecf@dol.gov